ROBERTS, surviving partner, vs. CROWLEY.

1. When several writings in evidence all harmonize and bear with united and with powerful force against the verdict, a new trial may be granted.

2. A cross-interrogatory was not sufficiently answered, but the record does not affirmatively disclose that the court erred in overruling the exception, the time and mode of taking and presenting the exception not appearing.

3. All relevant facts transpiring between the wrongful discharge of a servant and the trial of his action therefor, (the same being an action for breach of the contract of employment, and brought before the contract term had expired,) may be considered in estimating the damages. Measure of damages for the breach in question indicated.

October 5, 1888.

Evidence. Verdict. New trial. Interrogatories. Practice. Master and servant. Contracts. Actions. Damages. Before Judge VAN EPPS. City court of Atlanta. March term, 1888

John Crowley sued May & Roberts (doing business under the name of The May Utility Works) for $1,094, for a breach of contract of employment. The suit was brought May 3d, 1887, and tried in March, 1888. He alleged that, about January 1, 1887, they entered into a contract with him for his services as superintendent of their furniture factory for the twelve months next ensuing, for $1,200 per annum, to be paid as follows: $1,000 as a regular salary, payable weekly at the rate of $3 per day, and at the end of each month an additional sum sufficient to make in the aggregate $1,000. In addition to this, as a premium upon petitioner's success, he was to be paid $200. He entered upon his duties and performed them according to the stipulations of the contract, until about March 2, 1887, when defendants, without any

lawful cause and without any fault on his part, contrary to his wishes and to the contract, discharged him. From the 1st of January to the 2d of March, he was entitled to $172.66⅔, upon which he has been paid only $156. By reason of his being thrown out of employment, he was damaged the further sum of $827.33⅓, the balance that would have accrued to him as wages. He was further damaged the sum of $200, promised him as above mentioned. He did faithfully discharge his duty, and at the time of his discharge there was due him out of said $200, $36.66⅔ for the time actually consumed. He was put to expense, inconvenience, etc.

In addition to the plea of the general issue, Roberts, surviving partner, pleaded that the plaintiff did not discharge his duties; that he came late in the morning to his work, delayed the men working under him because he had the keys, and they could not get material with which to work; that he recklessly and wilfully destroyed a large quantity of material, which was not only fit for use, but had been actually manufactured ready for being put together, by burning it for fuel and otherwise destroying it; that he reported full time for men working under him, and they were paid, when they had not put in full time, which plaintiff knew they could not put in because he was not there in time himself, and had the keys to the material and varnish rooms, etc.; that by such misconduct May & Roberts were damaged $1,000; and for the causes above set out plaintiff was discharged. It was further pleaded that, by proper diligence, plaintiff could have earned as much during 1887 as he claims to be due him. Further, that he did earn during that year, after his discharge, $560.85 for work done for the Cole Manufacturing Company, in Memphis, Tenn. Further, that plaintiff was working for defendants under a written contract

which gave them the right to discharge him whenever they were not satisfied to retain him. This contract is attached to the plea, and so far as material is as follows: It is dated January 13, 1886. By it plaintiff was employed at $3 per day for no specified time, and the right was reserved by May & Roberts to discharge him whenever not satisfied to retain him. They further pleaded that the contract above mentioned extended to and covered the services rendered by plaintiff during the part of 1887 that he was so employed, and that there was no change of that contract, except as to increase of salary, and said change was conditioned upon plaintiff's making the business more profitable than it was for 1886, which he failed to do.

Upon the trial, much testimony was introduced. Briefly stated, it was as follows: The plaintiff was examined by interrogatories, and testified that, having worked for defendants in 1886, in the fall of that year he re-engaged with them for the year commencing January 1, 1887, at the rate and on the terms mentioned in the declaration. At the end of the first week in January, 1887, finding that he was credited with only $18, he called the attention of Roberts to the fact, and Roberts stated that he would pay the extra amount at the end of the month because it was dull times. This they failed to do. On March 3, 1887, May came to plaintiff, saying that business was dull, when in fact the machinery part of the factory had just ceased operations, the balance being engaged in finishing unfinished work, and preparing, as defendant said, to take stock. In plaintiff's contract it had been provided that he should have a month's vacation, and he selected the month of June, as that was the dull season. When the machinery was stopped, they proposed that he should take March instead of June, to which he agreed. He then

went with May to the office, and Roberts handed him $12 for the four days of that week. Nothing was said at that time regarding the future, except, upon Roberts' stating that the dull season would last some time, plaintiff stated that he would hold himself to his engagement and would look to the firm for the year's pay; to which no reply was made. · He did not return to Atlanta to work, because, about a week before his vacation expired, he wrote to defendants, and they notified him in reply that they would not require his services. They had never complained of a want of faithfulness or ability on his part, but had often spoken of him in flattering terms. He had no contract with them for 1886 except by letter, and his contract for 1887 was not in writing, there being no change as to the terms of his employment except as to increase of wages. He never expressed himself as satisfied to receive the money paid in March as payment in full or as an ending of his employment. He did ask and obtain a letter from defendants, as it was a universal custom for an employé starting on an excursion to have a letter from his employer to back him up on his travels. By the 5th cross-interrogatory he was asked, "Have you made any effort to get employment since leaving May & Roberts? if so, state the persons to whom you applied; when and where; did you succeed in getting employment; if so, upon what terms, what were the terms of your contract with each employer; give the names of each person employing you since leaving May & Roberts; the time employed and the amount paid you by each; state how much money you have made altogether since you left May & Roberts." To this the witness answered, "I have made continuous efforts to obtain employment since the notification sent me by May & Roberts. I applied to the Cole Manufacturing

Company, of Memphis, for employment, on learning from May & Roberts by letter that they would not need my services longer. I engaged with them about the 16th of March, and up to the 17th of December, 1887, have earned about $561.87, as per their statement appended and made part of this answer. I have had no idle time since I left the city of Atlanta in my vacation. I will send a sworn statement from the firm of Cole & Company, showing the exact amount, if necessary." Attached to the answers was the statement of the Cole Mfg. Co. that plaintiff had worked for them during 1887 at weekly wages, but under no contract or agreement, being liable to discharge at the pleasure of the foreman, to the amount of $561.85.

The plaintiff introduced one Rigden, who testified that he was employed by defendants from July, 1886, to early in March, 1887. During the first week in March, he heard plaintiff tell May that he (plaintiff) would hold the firm responsible for the contract, to which May's reply was, "You cannot do anything, for you are late sometimes at the factory." Witness did not hear the balance of the conversation. Plaintiff was general superintendent; had control of the hands; kept their time, etc. There was an hour fixed for going to work in the morning, and it was plaintiff's duty to see that the men were there at the proper time, and to keep their time. In the month of February, plaintiff was late a few mornings on account of the sickness of his wife and daughter; that is the only time witness remembered his being late; he asked another man to keep the time when he was obliged to be late. Every man was in his place and went to work whether plaintiff was there on time or not. There was very little waste of material at the factory; less than at other factories. Witness had seen a few split and useless bedstead legs

,or posts sent down to the furnace to be burned. Plaintiff sent his wife and daughter off about two or three weeks before he left; they were sick. Witness was not present at any conversation between plaintiff and Roberts in which Roberts complained about the falling off of business and about plaintiff's part of it; and did not hear plaintiff say that if Roberts was not satisfied with his work or the way he was doing, he could pay him off and let him leave, or anything to that effect. During the month of January, there were about $6,000 worth of goods shipped out of the factory. Witness had heard Roberts tell plaintiff that there were not over $3,000 or $4,000 worth. The signature to the contract appended to the plea was not the signature of plaintiff.

Two letters from plaintiff to May were introduced. They were dated November and December, 1885, and related to employment of plaintiff by defendants, he offering to work for a year at $3.50 a day. Also a letter from defendants to plaintiff, dated April 6, 1887, stating:

" Yours of 3d was handed to us this morning by Mr. Rigden. We desire to state that your discharge took effect from the date you were paid off and was final, and was so accepted by you. We shall have no use for your services at any time."

Also the following, dated March 3, 1887, and signed by defendants:

" To whom it may concern:—The bearer, Mr. John Crowley, has been in our employ for more than a year past as superintendent and designer, for which position he is entirely competent, and is recommended for similar positions."

For the defendants quite a number of witnesses were introduced. They had been employed in various capacities at the factory during the same time plaintiff was. They testified that he was very frequently late in the morning in getting to his work, sometimes from half an hour to two hours; that he delayed the hands in this way; that this was not only during the year 1887, but

also the latter part of 1886; that he also caused much waste of time by talking to the hands about matters not connected with the business; that he did cause material to be burned in the furnace, part of which could have been saved and used, and upon some of which skilled labor had been used; that expenses had been reduced since plaintiff left, the works having been shut down about four months just after he left; that it was his business to take the time of the men, and they always got full time, although they did not work full time; and that most of the time Mr. May was away traveling and Mr. Roberts was at work in the office. One witness testified that he tried to save a lot of the stuff sent to the furnace, and told plaintiff that Mr. May had directed it to be saved, but plaintiff ordered him to burn it. Another swore that he and Rigden were present when Roberts complained to plaintiff of the way business was going on, and plaintiff replied, if he was dissatisfied, plaintiff would quit at any time he paid plaintiff up. These complaints were frequent, occurring mostly during the last month that plaintiff was employed there. The complaints were about not being able to fill orders; about not having strips to pack furniture with; and about his not getting to the factory as early as he ought to. Witness had seen the chute going down to the furnace full of strips, a great many of which would have made good packing stuff.

Roberts testified, among other things, that the written contract appended to the plea was made with plaintiff for the year 1886, and the only change for 1887 was as to an increase of salary, and this increase was to be on condition that he was to make the business successful; but that he had caused very heavy loss. The factory was shut down in March. From January to March, witness was complaining to plaintiff that the

business was not successful; that the latter did not keep his promises; and that defendants could not stand it much longer. It culminated, on the third of March, in plaintiff's discharge. He was paid all he was entitled to. Complaints were made to plaintiff in the presence of Rigden. Plaintiff's discharge was because of the business not being a success, because defendants had no money to go on with, and because of a waste of material. The loss to the firm was chargeable largely to plaintiff's mismanagement. One cause of his discharge was because of his coming late in the morning. Witness did not know at the time that plaintiff was giving men full time when they had not worked full time. Did not agree to pay plaintiff anything at the end of the year, and never paid him more than $3.00 per day. He was to be paid $200 at end of year, conditioned upon success. The contract in evidence was given to plaintiff for his signature, and was returned to witness by plaintiff himself. Witness did not know of the causes for dissatisfaction with plaintiff until about January 1st, 1887, and wanted to shut down then because the business had been unprofitable, etc., but was persuaded by plaintiff and May to continue the business for a while to work up unfinished stock, etc. At the time plaintiff was paid off, he did not say that he would hold defendants for the whole year's time; he made no demand whatever for any additional money, and none was ever made except by filing of the suit. He said he did not care whether witness paid him more or less—$2.00 a day or $3.00,—he was perfectly satisfied. After plaintiff had been paid off and had expressed himself as satisfied, he asked witness to give him a letter, as he was going away. At that time, witness had no knowledge of the complaint against him, except that he had not done his duty and had wasted material; and finally gave him a letter stating that he was a competent foreman.

Defendant also introduced the contract, a copy of which was appended to the plea. The jury found for plaintiff $312.25. The defendant moved for a new trial on the following grounds:

(1) The verdict was contrary to law, evidence and the charge of the court.

(2) Error in overruling defendants' motion to exclude the interrogatories of plaintiff, on the ground that he had not answered the fifth cross-interrogatory fully, specifically and clearly.

(3), (4) Error in refusing to charge the rule in reference to preponderance of evidence in civil cases, and the rule which should control the action of the jury when there is a conflict of testimony.

The motion was overruled, and Roberts, surviving partner, excepted.

Milledge & Blalock, for plaintiff in error.

Alexander & Turnbull, *contra.*

Bleckley, Chief Justice.

The writings in evidence are very powerful in their bearing against the correctness of the verdict, so much so that the matter ought to be investigated by a new trial. There is nothing to contradict the testimony of Roberts that the paper purporting to be the contract for 1886 was handed to him by Crowley with his name signed to it. Whether Crowley signed his own name, makes no difference. He could adopt the signature made by another, and so he did, if he delivered the paper to Roberts as his contract. He testifies that the contract for that year was not in writing, except as contained in certain letters; and so he may think, but if he delivered to Roberts the instrument dated January 13th, with his name appended to it, it was in writ-

ing, and he is mistaken. The instrument shows for itself, and it contains a stipulation by which May & Roberts could discharge Crowley as any time. And there is no doubt, according to all the evidence, that the contract for 1887 was the same as that for 1886, save as to the amount of compensation.

The testimonial given by May & Roberts to Crowley upon his discharge, on the 3d of March, 1887, is almost conclusive that both parties treated the engagement as then at an end; for it recommends him for employment " to all whom it may concern." And he accepted employment in Memphis within a few days thereafter. He had sent away his family a short time before, and neither he nor they, so far as appears, have ever re-turned to Atlanta. When only two months of the year had elapsed, why should he want to be recommended for similar positions if he retained his position with May & Roberts? Would he have asked for such a recommendation unless he was out of their employment? Would they have given it unless he had gone out willingly, or consistently with some conceded right in them to discharge him? It may fairly be presumed that there was some human nature in May & Roberts, if not in Mr. Crowley himself. Giving both parties credit for an ordinary share in the usual modes of thinking and feeling, the letter of recommendation was not a mere vacation circular, nor was it the result of an unsatisfactory settlement of accounts. In the general course of things, it would follow no settlement which was not understood to be final and mutually satisfactory. Another writing was the letter of April 6th from May & Roberts to Crowley, in which they told him his discharge was accepted by him as final. That statement was made directly to him, and if untrue, called for contradiction; but there is no indication of a

reply to it by letter or otherwise. The three writings to which we have called attention all harmonize exactly, and bear with united force against the verdict.

2. The cross-interrogatory excepted to was not fully answered. If the exception was taken in due time and manner, and section 3892 of the code complied with, it ought to have been allowed. *Howard vs. Chamberlin,* 64 *Ga.* 684. But the record does not inform us upon these points, and so we cannot say that it affirmatively appears that the court erred in refusing to sustain the exception. *Galceran vs. Noble,* 66 *Ga.* 367.

3. If the plaintiff below was entitled to recover at all, the sum found by the jury was probably warranted by the evidence. In such an action, the measure of damages is the actual loss sustained by breach of the contract, and in estimating the amount, all the facts down to the time of trial may be considered. 2 Suth Dam. 471, *et seq.* and notes ; 1 Sedg. on Meas. Dam. (7th edition,) 198 *et seq.* and notes; Wood's Master and Servant, §125, and notes. It is the breach that gives the right of action, and the subsequent facts are not the cause of action, but legal light by which to follow the breach to its pecuniary result. Everson *vs.* Powers, 89 N. Y. 527. Of course the discharged servant is bound to use due diligence to prevent the loss from being more than necessary ; and to that end must seek employment in similar business and derive such income from it as he reasonably can, which is to be deducted in fixing the damages to be recovered. The burden, however, of showing that he did obtain employment, or could have obtained it by due diligence, is on the other party.

The court should have granted a new trial on the general grounds of the motion.

Judgment reversed.